UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TYKEE J. ROSS,

                Petitioner,

                                    CASE NO. 08-12493

v.

                                    PAUL D. BORMAN

KENNETH McKEE,                  UNITED STATES DISTRICT JUDGE

                Respondent.

_____/

## OPINION AND ORDER
## DENYING THE HABEAS CORPUS PETITION,
## GRANTING IN PART A CERTIFICATE OF APPEALABILITY, AND
## GRANTING LEAVE TO PROCEED *IN FORMA PAUPERIS* ON APPEAL

Petitioner Tykee J. Ross is a state prisoner at Carson City Correctional Facility in

Carson City, Michigan.  In 2008, Petitioner filed a *pro se* habeas corpus petition

challenging his 2001 state conviction for felony murder.  The Court dismissed the petition

as untimely, but the United States Court of Appeals for the Sixth Circuit reversed this

Court in part after determining that equitable tolling of the one-year statute of limitations

applied and that the habeas petition should be treated as having been timely filed.  The

Sixth Circuit remanded Petitioner's case to this Court for a decision on the merits of

Petitioner's claims.  Having reviewed the pleadings and state court record, the Court

concludes that Petitioner is not entitled to habeas corpus relief.  Therefore, his petition is

denied.  A procedural history and analysis follow.

## I.  Background

### A.  The Charges,  Trial, and Sentence

Petitioner was charged in Wayne County, Michigan with first-degree (felony) murder, Mich. Comp. Laws § 750.316(1)(b), armed robbery, Mich. Comp. Laws § 750.529, and possession of a firearm during the commission of a felony (felony firearm), Mich. Comp. Laws § 750.227b.  The charges arose from the robbery of the Dollar Value Plus store on Wyoming Street in Detroit, Michigan on December 11, 2000, and the fatal shooting of the store's owner, Hani Zebib.  Petitioner was tried in Wayne County Circuit Court with co-defendants Roy Jackson and Demel Dukes.  Petitioner and Dukes were tried before the same jury, but Jackson had a separate jury.

### 1.  Prosecution Witnesses

#### a.  Joann Jackson

Joann Jackson testified that she was working at the Dollar Store, along with Cynthia Foy and Mr. Zebib, on December 11, 2000.  She was stocking the shelves in the back of the store when she heard someone say, "Open the cash register."  She looked over and saw Mr. Zebib and Ms. Foy by the cash registers.  There was a gunman in front of the counter by Ms. Foy, another person behind the counter, and two people at the door to the store.  They wore masks covering their faces and black or blue clothing that covered their bodies.  As she tried to hide, she heard two gunshots.  A short time later, Ms. Foy called to her and said that Mr. Zebib had been shot.  She went to the front of the store and let a customer leave the store.  She then locked the door and called the police.  None of the

2

store employees had any weapons.

### b. Cynthia Foy

Cynthia Foy was a cashier at the Dollar Store. She testified that, on the afternoon of December 11, 2000, she was behind the counter helping a customer when four men rushed into the store. Two of the men had guns. They stopped at Mr. Zebib's register, pointed their guns at him, and said, "Open the register, give me your money." Mr. Zebib took some money out of the register and handed it to the man who was doing all the talking. At that point, she heard a gunshot, and Mr. Zebib appeared to have been shot. The man who was talking told the other man to go to the register and get the rest of the money. As the man passed her, she heard a second gunshot, and the men ran out the door.

### c. Ursula Jordan

The customer in the store at the time was Ursula Jordan. She testified that she was standing at the register when two men came in the store. One of them said, "Open the register." She put her head down, but after the first register opened, somebody instructed the man in the store to open the second register and not to get a gun. She heard more gunshots and then the sound of men running out of the store. She left the store and alerted people in a shop next door that a man had been shot at the Dollar Store. Then she went home.

### d. The Medical Examiner and Firearms Expert

An assistant medical examiner for Wayne County testified that Mr. Zebib died

3

from a single gunshot wound which caused extensive bleeding and that the manner of death was a homicide. No weapon was recovered, but an expert in firearms identification testified that two spent casings in evidence were fired from the same weapon and that the bullet in evidence was caliber-compatible with the casings.

### e. Officers Michael Smith, Michael Curvin, and Glyne Davis; chemist William Steiner

Police officers Michael Smith and Michael Curvin testified about several sets of fresh footprints in the snow behind the Dollar Store. The footprints led away from the store to a residence on Washburn Street. Three sets of tracks went up the rear staircase of the residence on Washburn; the other four sets of tracks continued down Washburn and became intermingled with other footprints. Na'tisha Wright, Dale Wright, and Walter Edwards were inside the Washburn residence. They were brought to police headquarters for questioning. Officer Glyne Davis testified that he ordered evidence technicians to perform a gunshot residue test on the two men, and forensic chemist William Steiner testified that gunshot residue was detected on a knit hat and a coat belonging to Walter Edwards.

### f. Ramone Neal

Ramone Neal testified that he was a friend of the defendants and that one day Roy Jackson approached him and asked to borrow Mr. Neal's navy blue jacket. Mr. Jackson explained that he was "fixing to shoot a move," which meant that he was planning to see a girl or planning to make a run to the store. Mr. Jackson took Mr. Neal's jacket and then

4

left the area in a red Neon car with Petitioner.  About an hour or an hour and twenty minutes later, Mr. Neal saw Petitioner.  He asked Petitioner for a ride home, but Petitioner said he could not give him a ride because he had to hurry up and go somewhere, as he did not know whether someone had seen his car.  Petitioner also said they had just done a robbery at the Dollar Store and that Roy Jackson had shot a man in the stomach.

Mr. Neal denied being a participant in the crime, and he denied receiving a deal for his testimony, but he was a reluctant witness.  He admitted that he failed to appear in court earlier in the trial and that the police had subsequently detained him.  He claimed that he gave a statement to the police because they had threatened him with life imprisonment.

### g.  Investigator Andrew Sims

Petitioner reported to the police station, and on January 7, 2001, Andrew Sims of the Detroit Police Department informed Petitioner of his constitutional rights.  According to Sims' testimony at trial, Petitioner stated that he understood his rights and that he was willing to waive his rights and answer Sims' questions.  Petitioner then wrote a statement in his own handwriting, stating that,

> one morning Roy came to me and Demel . . . saying that he knew how to make some money.  We went there to the Dollar Store.  Roy had the gun. Mel had got the money and I was at the door.  Roy had said to the guy, open up the register.  He did.
>
> I don't even know why he shot the gun.  I left out after that.  They fled behind me.

5

On January 8, 2001, Investigator Sims took a statement from co-defendant Roy Jackson.  Mr. Jackson informed Investigator Sims that he, Tykee, and Demel went to the Dollar Store and that he (Jackson) accidentally shot the man in the store.  Jackson claimed that he went in the store to rob it and that he fired two shots:  one in the air and the other one at the man, because the man moved and he thought the man was going to harm Demel, who was getting money out of the register.

### h.  Sergeant Maria Cox-Borkowski

The officer in charge of the case was Sergeant Maria Cox-Borkowski.  She advised Petitioner of his constitutional rights and took a statement from him after Investigator Sims spoke to him.  Petitioner's statement to Sergeant Cox-Borkowski went like this:

Question:  Tell me what happened on December 11, 2000, when Mr. Zebib was fatally shot at the Dollar Store on Wyoming near Fenkell.

Answer:  Roy Jackson, came over [to] my crib that day and asked me and Demel if we wanted to make some money.  Me and Demel agreed with it.  From the[re] we went to the Dollar Store.  I went in and I was at the door.  Roy had the gun and Demel was suppose[d] to get the money.  Roy came in the door and pointed the gun at the owner and told him to open the register.

I guess the man didn't open the register because after Roy told the man to open it Roy shot once in the air.  That's when Demel got the money out.  Then I heard a second gunshot and I turned around and saw the man looking puzzled and at that point Demel and me and Roy left the store.

Question:  Where did you go after you left the store?

Answer:  We went back on Cherrylawn to an abandoned house on the east side of the street between Eaton and Linden.  We went into the backyard, split the money and left.

6

Question:  How much money did you get from the Dollar Store?
Answer:  About five hundred dollars.  We got about a hundred and fifty dollars a piece.

Question:  Were you wearing masks in the Dollar Store during [the] robbery?

Answer:  Yes.

Question:  What kind and what color?

Answer:  I had a black ski [mask] with velcro in the back.  One of the others had one, too.  I'm not sure what kind the other [person] had.

Question:  What kind of gun did Roy have?

Answer:  It was a black automatic, either a nine millimeter or forty-five.

Question:  What did Roy do with the gun afterward?

Answer:  He took it with him.

Question:  Do you know where he went?

Answer:  No.

Question:  Where did Demel go?

Answer:  I don't know.

Question:  Did you or Demel have a gun?

Answer:  No.

Question:  Where did you go to?

Answer:  I went home first, took my dog out and then got a room in the Crystal House on Eight Mile and Greenfield.

Question:  How did Roy say you and Demel were going to make the money?

7

Answer:  He said rob the Dollar Store.

Question:  How many people did you see in the Dollar Store?

Answer:  Maybe five.

. . . .

Question:  How did you get to the Dollar Store?

Answer:  We walked there.

Question:  How did you leave?

Answer:   We ran back.

Question:  Did you answer these questions truthfully?

Answer:  Yes.

Question:  Were you promised anything to make this statement?

Answer:  No.

Question:  What did you do with the ski mask you wore during the fatal shooting at the Dollar Store?

Answer:  I threw it in the  garbage.

Question:  Is there anything you would like to add?

Answer:  No. This is the whole story.  I didn't want that guy to get hurt.

### i. Investigator Barbara Simon

Investigator Barbara Simon of the Detroit Police Department took a statement

from Roy Jackson and Demel Dukes.  Mr. Dukes informed Investigator Simon that he,

Tykee, Ramone, and Roy got together and talked about "hitting a lick" at the Dollar

8

Store.  The four of them went to the Dollar Store, and when they got there, Tykee and Roy went inside the store.  Ramone did not go inside; he turned around and ran.  Roy had the gun and ordered the people to hand over the money.  Roy fired the gun once into the air and he (Dukes) took the money out of the cash register.  As he left the store, he heard another gunshot.  The group went back to Cherrylawn where he took two hundred dollars and gave the rest of the money to the other men.

Roy Jackson informed Investigator Barbara Simon on January 8, 2001, that he, Tykee, and Demel went to the Dollar Store to rob it.  It was his idea to rob the store and he was the only person with a gun.  Tykee and Demel followed him into the store.  Petitioner stood at the front door as the "look-out."  When he (Jackson) told the man behind the counter to open up the cash register, the man just looked at him.  So, he fired one shot into the air.  Then, the man opened the cash register and Demel got the money out of the cash register.  He shot the man when he moved.  Then they ran out of the store to a vacant house on Cherrylawn where they split the money.  Jackson concluded his statement by saying that he was sorry for what happened and that he did not intend for anyone to be shot and killed.

### 2.  Defense Witnesses

#### a.  Ramone Neal

Ramone Neal testified for the defense that, at some point, he called Roy Jackson's attorney and advised the attorney that his statement to the police was not true and that the police forced him to make the statement and threatened to charge him with perjury or

9

murder and robbery with life imprisonment if he did not implicate someone. Mr. Neal

admitted that he had been locked up for three weeks and was not happy about being in

court, but he denied recanting his prior testimony as a result of being locked up in the bull

pen with the three defendants for eight hours. He claimed that he had talked with his

mother, who told him to tell the truth, and the truth was what he was currently saying.

### b. Na'tisha Wright

Na'tisha Wright testified that she lived directly behind the Dollar Store at 15094

Washburn Street. When she got home on December 11, 2000, her uncle (Delmonti

Wright) and her boyfriend (Walter Edwards) were there. About 5:00 p.m., she and Mr.

Edwards were shoveling snow, and Mr. Wright came outside to dispose of trash. About

11:00 p.m., the police came to her home, arrested the three of them, and questioned them

about the murder at the Dollar Store. They were released later that night, but a couple of

weeks later, the police came back and re-arrested them. She was released by herself. Ms.

Wright claimed that Mr. Wright and Mr. Edwards did not have ski masks on December

11, 2000, and that none of them were at the Dollar Store at 5:00 p.m. that day.

### c. Walter Edwards

Walter Edwards provided testimony similar to Ms. Wright's testimony. He

testified that he was home most of the day in question and that he wore a black jacket and

black knit hat when he went outside to shovel. He did not see any people running through

his backyard and he could not explain why gunshot residue subsequently was detected on

his hat and jacket. He was arrested, released about six or seven hours later, re-arrested a

10

few weeks later on January 4, 2001, and released two days later.

### d.  Petitioner Tykee Ross

Petitioner was the only co-defendant to testify.  He explained that, on January 6, 2001, he went to police headquarters after learning that the police were looking for him.  Roy Jackson and Roy's parents accompanied him.  When Sergeant Cox-Borkowski attempted to interrogate him, he told her that his lawyer was on the way there and that he would talk when his lawyer arrived.  Sergeant Cox-Borkowski argued with him and told him that he had to talk to her.  Then Investigator Barbara Simon tried to interrogate him.  He told her the same thing about his lawyer being on the way.   Next, a male officer talked to him and told him that Ramone had placed him at the scene.  The next day, he was interrogated again, but he repeated that his lawyer was on the way.  Officer Sims slapped him and told him that, if he did not cooperate, he would spend the rest of his life in jail for murder.  Sergeant Cox-Borkowski told him the same thing.  This scared him and convinced him to give a statement.

Petitioner denied going to the Dollar Store, helping with the robbery, or seeing Roy Jackson shoot anybody.  He also denied telling Ramone Neal the things that Mr. Neal had mentioned during his testimony.  He claimed that his statement to the police was the result of being forced to make an incriminating statement or face life in jail.  But he admitted that, while detained, he had passed a note to Demel Dukes in which he informed Dukes that he had said the following things to the police:

> I said me and you was at the house.   Roy came over and asked me if

we wanted to make some money.  We said, yeah.  Roy said, come with me.
We went to the Dollar Store.  Roy pulled a gun out and said, open the cash
register.  The man hesitated.

Roy shot in the air.  I was at the door and when he opened the cash
register you grabbed the money and said let's go.  Roy . . . shot the man.
Tykee and Mel couldn't understand why he did it.  Me and you and Roy
went and ran home to an abandoned house and split the cash after we cursed
Roy out about shooting him.

We didn't know how he shot him.  We thought he shot in the air
again until he told us he did.  I told them I didn't know where Roy got the
gun from or where he put it.  We didn't want anybody to get hurt, but I
guess Roy's plans are different.  Me and Mel cried afterward.  The reason I
said that was to protect us from a murder case because they lie and put us at
a crime that we was not at.  It scared me.

You know you like a brother to me to grow with my kids to lay
down my life.  If Roy . . . wants to do a murder and try to blame it on us let
him do this, his time, not us.  I'm trying to go home.

### 3.  The Rebuttal Witness

Investigator James Fisher explained on rebuttal how the police investigation

developed.  He stated that the police received an anonymous tip, which prompted him to

go to an address where certain family members knew Mr. Neal.  As he left the house, he

observed two individuals walking down the street.  One of them fit the description of Mr.

Neal, and when he stopped them, Mr. Neal identified himself.  He took Mr. Neal to police

headquarters where he took a six-page statement from him on January 5, 2001.  He asked

Mr. Neal what happened, and Mr. Neal "poured it all out."  He did not threaten Mr. Neal,

nor tell him that he was implicated in the crime.

### 4.  The Verdict and Sentence

The prosecutor dismissed the felony firearm charge against Petitioner during trial, and on December 17, 2001, Petitioner's jury found him guilty of felony murder and armed robbery. The trial court sentenced Petitioner to life imprisonment for the murder and to a concurrent term of seventeen to thirty years for the robbery.

## B.  The Direct Appeal

Petitioner appealed his convictions and sentence as of right on grounds that: (1) the trial court infringed on his right of confrontation by limiting cross-examination of Investigator Andrew Sims regarding Roy Jackson's statement to Sims and by not allowing his jury to hear Jackson's defense witnesses; (2) the evidence at trial was insufficient to convict him of felony murder; (3) his convictions and sentences for felony murder and armed robbery constituted double jeopardy; and (4) the prosecutor's denigrating remarks about trial counsel constituted reversible error. The Michigan Court of Appeals vacated Petitioner's conviction and sentence for armed robbery on double jeopardy grounds, but affirmed Petitioner's murder conviction. *See People v. Ross*, No. 240371, 2003 WL 22439719 (Mich. Ct. App. Oct. 28, 2003).

Petitioner raised the same issues, with the exception of the double jeopardy claim, in an application for leave to appeal in the Michigan Supreme Court. While his case was pending in the Michigan Supreme Court, but after the United States Supreme Court issued its decision in *Crawford v. Washington*, 541 U.S. 36 (2004), Petitioner expanded his claim under the Confrontation Clause by arguing that co-defendant Roy Jackson's statement to the police should not have been admitted in evidence. On June 10, 2004, the

13

Michigan Supreme Court denied leave to appeal because it was not persuaded to review

the issues, *see People v. Ross*, 470 Mich. 874 (2004) (table),[1] and on September 28, 2004,

the state supreme court denied reconsideration, *see People v. Ross*, 471 Mich. 887 (2004)

(table).[2]

## C. The Post-Conviction Proceedings

On January 25, 2005, Petitioner filed a motion for relief from judgment in which

he claimed that: (1) Michigan Court Rule 6.508(D)(3) did not apply due to a retroactive

change in the law; (2) he was entitled to retrospective application of *Crawford v.*

*Washington*; (3) he was entitled to a new trial because the trial court did not allow him to

cross-examine his co-defendant; (4) there was "good cause" for his failure to raise several

issues on direct appeal; (5) appellate counsel was ineffective; (6) his Fourth Amendment

rights were violated as a result of unnecessary delay after his arrest; (7) his inculpatory

statement should have been suppressed; and (8) he was denied effective assistance of

counsel during his *Walker* hearing.[3] The trial court determined that Petitioner was

precluded from raising his third claim on post-conviction review because he raised that

claim on direct appeal. The trial court declined to grant relief on Petitioner's other claims

---

[1] Justices Michael F. Cavanagh and Marilyn J. Kelly voted to grant leave to appeal.

[2] Justice Kelly would have granted reconsideration and, on reconsideration, would have granted leave to appeal.

[3] A *Walker* hearing is a pretrial evidentiary hearing in the trial court on the voluntariness of a defendant's statement to the police. *See People v. Walker*, 374 Mich. 331 (1965).

14

because the claims lacked merit and Petitioner failed to show "good cause" and "actual prejudice" under Michigan Court Rule 6.508(D)(3)(a) for not raising the claims on direct appeal.

In an application for leave to appeal the trial court's decision, Petitioner argued that: (1) the trial court erred when it failed to grant relief or an evidentiary hearing on his motion for relief from judgment because *Crawford v. Washington* was retroactive and his co-defendant's statement was improperly used as evidence at his trial; (2) the trial court erred by failing to address his *pro se* claims regarding about counsel, the delay before arraignment, the admission of his statement, and his warrantless arrest; and (3) the trial court erred by failing to issue an order on his *pro se* motion to amend the findings and judgment. On March 30, 2007, the Michigan Court of Appeals denied leave to appeal because Petitioner failed to establish entitlement to relief under Michigan Court Rule 6.508(D). *See People v. Ross*, No. 271952 (Mich. Ct. App. Mar. 30, 2007). Petitioner applied for leave to appeal in the Michigan Supreme Court, but the clerk of the Michigan Supreme Court rejected his application as untimely on July 6, 2007. *See* Affidavit of Corbin R. Davis, ECF No. 8-7.

**D.  The Habeas Petition and Responsive Pleading**

On June 11, 2008, Petitioner filed his federal habeas corpus petition under 28 U.S.C. § 2254. Respondent moved to dismiss the habeas petition on the ground that Petitioner failed to comply with the one-year statute of limitations for habeas petitions. The Court agreed with Respondent and, on March 11, 2010, the Court dismissed the

15

petition as time-barred.  *See* ECF No. 17.

Petitioner appealed the Court's decision, and on February 28, 2012, the United States Court of Appeals for the Sixth Circuit affirmed this Court's determination that the petition was untimely, but reversed this Court's decision to deny equitable tolling of the limitations period.  The Court of Appeals remanded the case to this Court for a decision on the merits of Petitioner's application for the writ of habeas corpus.  *See Ross v. McKee,* 465 F. App'x 469 (6th Cir. 2012).

Petitioner's grounds for relief are:  (1) the trial court's limitation on the cross-examination of Officer Sims infringed on his right of confrontation; (2) the evidence at trial was insufficient to convict him of felony murder; (3) his convictions and sentences for felony murder and armed robbery violate the Double Jeopardy Clause; (4) the prosecutor's remarks about trial counsel were reversible error; (5) procedural default cannot be used to prevent him from seeking relief regarding his non-testifying co-defendant's statement to the police; (6) he is entitled to retroactive application of *Crawford v. Washington*; (7) the trial court violated his confrontation rights by allowing his non-testifying co-defendant's statement to the police to be used against him; (8) he has demonstrated "good cause" for the failure to raise his claims on direct appeal and actual prejudice from the trial errors; (9) appellate counsel was ineffective; (10) his confession was involuntary and should have been excluded due to unnecessary delay in his arraignment; (11) his inculpatory statement was the result of an illegal arrest; (12) he was denied effective assistance of counsel during his *Walker* hearing; (13) the trial court

16

erred when it failed to grant relief or an evidentiary hearing on his motion for relief from judgment; and (14) the trial court erred when it failed to rule on the issues that he raised in his *pro se* supplemental brief on post-conviction review.

Respondent argues that Petitioner's claims about the Confrontation Clause, his confession, his attorneys, and the prosecutor's closing argument either were not fairly presented to the state court or are barred from substantive review by the doctrine of procedural default. Neither the failure to exhaust state remedies, nor procedural default, are jurisdictional limitations, *Pudelski v. Wilson*, 576 F.3d 595, 606 (6th Cir. 2009), and Petitioner's claims do not warrant habeas relief. The Court therefore excuses the alleged failure to exhaust state remedies and the alleged procedural defaults. The Court will proceed directly to the merits of Petitioner's claims, as this approach is more efficient than an analysis of whether Petitioner's claims are procedurally defaulted or were properly presented to the state court.

## II.  Standard of Review

"The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)." *Harrington v. Richter*, __ U.S. __, __, 131 S. Ct. 770, 783 (2011). Pursuant to § 2254, the Court may not grant a state prisoner's application for the writ of habeas corpus unless the state court's adjudication of the prisoner's claims on the merits

(1)     resulted in a decision that was contrary to, or involved an

17

> unreasonable application of, clearly established Federal law,
> as determined by the Supreme Court of the United States; or
>
> (2)     resulted in a decision that was based on an unreasonable
>          determination of the facts in light of the evidence presented in
>          the State court proceeding.

28 U.S.C. § 2254(d).[4]

> Under the "contrary to" clause [of § 2254(d)(1)], a federal habeas
> court may grant the writ if the state court arrives at a conclusion opposite to
> that reached by [the Supreme] Court on a question of law or if the state
> court decides a case differently than [the Supreme] Court has on a set of
> materially indistinguishable facts.  Under the "unreasonable application"
> clause [of § 2254(d)(1)], a federal habeas court may grant the writ if the
> state court identifies the correct governing legal principle from [the
> Supreme] Court's decisions but unreasonably applies that principle to the
> facts of the prisoner's case.

*Williams v. Taylor*, 529 U.S. 362, 412-13 (2000) (O'Connor, J., opinion of the Court for

Part II).  "[A] federal habeas court may not issue the writ simply because that court

concludes in its independent judgment that the relevant state-court decision applied

clearly established federal law erroneously or incorrectly.  Rather, that application must

also be unreasonable."  *Id*. at 411.

"AEDPA thus imposes a 'highly deferential standard for evaluating state-court

rulings,' *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997), and 'demands that state-court

---

[4]  The Court finds it unnecessary to decide whether the state courts adjudicated
Petitioner's claims "on the merits" or on some other ground, because the Court would
reach the same result whether the Court deferred to the state court's decision or reviewed
the issue *de novo*.  *Cf. Cotto v. Herbert*, 331 F.3d 217, 252-53 (2d Cir. 2003) (declining to
decide whether the state court's ruling on a Sixth Amendment claim was an "adjudication
on the merits" within the meaning of § 2254(d), because the court would reach the same
result under a *de novo* standard of review).

decisions be given the benefit of the doubt,' *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002)

(*per curiam*)." *Renico v. Lett*, 559  U.S. 766, 773 (2010).  "A state court's determination

that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists

could disagree' on the correctness of the state court's decision." *Harrington v. Richter*,

131 S. Ct. at 786 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  "[E]ven a

strong case for relief does not mean the state court's contrary conclusion was

unreasonable." *Id.*  (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)).  To obtain a writ

of habeas corpus from a federal court, a state prisoner must show that the state court's

ruling on his or her claim "was so lacking in justification that there was an error well

understood and comprehended in existing law beyond any possibility for fairminded

disagreement." *Id*. at 786-87.

### III.  Discussion

### A.  The Right of Confrontation  (claims one and seven)

Petitioner alleges that his right to confront the witnesses against him was violated

by the absence of any cross-examination of Investigator Andrew Sims and by the

admission of evidence concerning his co-defendants' statements.  The Confrontation

Clause of the Sixth Amendment to the United States Constitution is applicable to the

States through the Fourteenth Amendment, *Idaho v. Wright*, 497 U.S. 805, 813 (1990),

and it guarantees defendants in criminal prosecutions "the right . . . to be confronted with

the witnesses against him." U.S. CONST. amend. VI.  This right "includes the right to

cross-examine witnesses." *Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (citing

*Pointer v. Texas*, 380 U.S. 400, 404, 406-07 (1965)).

### 1. The Failure to Cross-Examine Investigator Sims

Petitioner alleges that his right of confrontation was violated because the jury did not hear any cross-examination of Investigator Andrew Sims who testified on direct examination about co-defendant Roy Jackson's pretrial statement to Sims.[5]  The Michigan Court of Appeals reviewed this claim for "plain error" because Petitioner did not object to the lack of cross-examination during his trial.  The Michigan Court of Appeals concluded that Petitioner did not sustain his burden of demonstrating plain error and that his claim did not warrant relief.

The facts leading to Petitioner's claim were summarized by the Michigan Court of Appeals as follows:

> At the close of the prosecutor's direct examination of Investigator Sims, the trial court dismissed the Ross/Dukes jury without objection so that counsel for codefendant Dukes could attend another matter.  Codefendant Jackson's jury remained to hear the cross-examination of Investigator Sims by codefendant Jackson's counsel.  The trial court indicated that counsel for defendant and codefendant Dukes could conduct their cross-examination of Investigator Sims later in the afternoon.  The Ross/Dukes jury returned to the courtroom later that day, but Investigator Sims was not recalled.

*Ross*, 2003 WL 22439719, at *4.

These factual observations are supported by the record before this Court.  (Trial Tr. Vol. VIII, 54, 81-85, Nov. 29, 2001).  But, as the Michigan Court of Appeals correctly

---

[5]  In state court, Petitioner also argued that the trial court violated his right of confrontation by not allowing his jury to hear co-defendant Roy Jackson's defense witnesses.  He has not raised that claim here.  *See* Habeas Pet., at 6.

pointed out,

> [a]lthough there is no indication in the record that defendant ever
> cross-examined Investigator Sims, nothing in the record suggests that the
> trial court prohibited defendant from doing so.  The record indicates that the
> trial court expressly stated that defendant would be allowed to
> cross-examine Investigator Sims, and there is no explanation on the record
> for the absence of this cross-examination.

*Ross*, 2003 WL 22439719, at *4.

Petitioner was afforded an opportunity to cross-examine Investigator Sims, but he

failed to take advantage of the opportunity, apparently through no fault of the trial court

or the prosecution.  Petitioner therefore has no right to relief on the basis of his claim that

there was no cross-examination of Investigator Sims.

### 2.  The Non-Testifying Co-Defendants' Statements to the Police

Petitioner asserts that evidence concerning his co-defendants' pretrial statements to

the police violated his right to confront the witnesses against him because his co-

defendants did not testify at trial.

"Testimonial statements of witnesses absent from trial [are admissible] only where

the declarant is unavailable, and only where the defendant has had a prior opportunity to

cross-examine." *Crawford v. Washington*, 541 U.S. at 59.[6]  Stated somewhat differently,

---

[6] The Court agrees with Petitioner that *Crawford v. Washington* applies to his
claims.  "State convictions are final 'for purposes of retroactivity analysis when the
availability of direct appeal to the state courts has been exhausted and the time for filing a
petition for a writ of certiorari has elapsed or a timely filed petition has been finally
denied.'" *Beard v. Banks*, 542 U.S. 406, 411 (2004) (quoting *Caspari v. Bohlen*, 510
U.S. 383, 390 (1994)).

the Sixth Amendment "contemplates that a witness who makes testimonial statements admitted against a defendant will ordinarily be present at trial for cross-examination, and that if the witness is unavailable, his prior testimony will be introduced only if the defendant had a prior opportunity to cross-examine him." *Giles v. California*, 554 U.S. 353, 358 (2008) (citing *Crawford v. Washington*, 541 U.S. at 68).

The term "testimonial" "applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Crawford v. Washington,* 541 U.S. at 68. Statements to the police are testimonial when the circumstances objectively indicate that there was no ongoing emergency, and "the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Davis v. Washington*, 547 U.S. 813, 822 (2006).

The co-defendants' pretrial statements were testimonial because they were made during interrogations by the police where the primary purpose was to establish or prove who was responsible for the robbery and murder at the Dollar Value Plus store. The co-defendants were "unavailable" for purposes of the Confrontation Clause because they chose not to testify at trial. *See United States v. Jones*, 124 F.3d 781, 786 (6th Cir. 1997)

---

Although the Michigan Court of Appeals rendered a decision in Petitioner's case before the United States Supreme Court decided *Crawford* on March 8, 2004, the Michigan Supreme Court did not deny leave to appeal until June 10, 2004, and it did not deny reconsideration until September 28, 2004. Petitioner's conviction became final ninety days later (on or about December 27, 2004) when the deadline expired to seek a writ of certiorari in the United States Supreme Court. *See* Sup. Ct. R. 13.1. Because Petitioner's conviction became final after *Crawford* was decided, *Crawford* applies to his claims under the Confrontation Clause.

(stating that the declarant "was unavailable as he refused to testify, invoking his Fifth Amendment right against self-incrimination"); *Mayes v. Sowders*, 621 F.2d 850, 856 (6th Cir. 1980) (stating that "[a] witness is not available for full and effective cross-examination when he or she refuses to testify").  And because Petitioner had no prior opportunity to cross-examine his co-defendants, the Confrontation Clause was violated by the reading of his co-defendants' statements to the police at trial.

The remaining question is whether the constitutional error was harmless. Violations of the Confrontation Clause are subject to harmless-error analysis, *Delaware v. Van Arsdall*, 475 U.S. 673, 684  (1986); *Vasquez v. Davis*, 496 F.3d 564, 574 (6th Cir. 2007), but a constitutional error is harmless only if it did not have a "'substantial and injurious effect or influence in determining the jury's verdict.'"  *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). "When a federal judge in a habeas proceeding is in grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict,' that error is not harmless.  And, the petitioner must win."  *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995).  Whether a violation of the Confrontation Clause was harmless error depends on a number of factors, including "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case."  *Delaware v. Van Arsdall*, 475 U.S. at 684.

23

The pretrial statements of co-defendants Roy Jackson and Demel Dukes clearly implicated Petitioner in the crime, but Petitioner inculpated himself in his statements to the police, which were read into the record. In his two statements to the police and in his note to Demel Dukes while the two of them were detained, Petitioner admitted that he went to the Dollar Store to rob it and that he stood at the door during the robbery. He also indicated in his statements that he knew Jackson had a gun.

In addition, Ramone Neal testified that Petitioner admitted to him that "they" had just done a robbery at the Dollar Store and that Mr. Jackson had shot a man in the stomach. Although Mr. Neal subsequently recanted his testimony, there was evidence suggesting that his recantation was the result of being confined for several hours with the defendants.

In light of Petitioner's own admissions to the police, his note to Demel Dukes, and Ramone Neal's testimony, the Court does not have a grave doubt as to whether the statements of Roy Jackson and Demel Dukes had a substantial and injurious effect or influence on the jury's verdict. The co-defendants' statements were cumulative evidence. Therefore, the reading of the co-defendants' statements was harmless error.

**B. Sufficiency of the Evidence** (claim two)

Petitioner alleges that the evidence adduced at trial was insufficient to convict him of felony murder. He points out that none of the eyewitnesses identified him as being a participant in the robbery and that the witnesses who did observe the robbery testified that the man at the counter, not the man or men by the doorway, fired a gun. Although

24

evidence of Petitioner's involvement came from Ramone Neal's testimony and from the co-defendants' statements to the police, they claimed that Petitioner was the unarmed "look-out" at the entrance to the store.  Additionally, according to Petitioner, there was no indication in Mr. Neal's testimony or in the co-defendants' statements that anything more than a robbery was discussed or planned.  Petitioner therefore contends that the prosecution failed to establish the "malice" element of felony murder.

### 1.  Legal Framework

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  *In re Winship*, 397 U.S. 358, 364 (1970).  "After *Winship* the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction" is

> whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.  But this inquiry does not require a court to "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt."  Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979) (internal citation and footnote omitted) (emphases in original).  This standard "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law."  *Id*. at 324 n.16.

"A sufficiency of the evidence claim is a 'steep climb' . . . ."  *United States v. Ross*, 703 F.3d 856, 882 (6th Cir. 2012) (quoting *United States v. Stafford*, 639 F.3d 270,

273 (6th Cir. 2011)).  Federal courts

> apply two layers of deference in reviewing habeas claims challenging evidentiary sufficiency.  *McGuire v. Ohio*, 619 F.3d 623, 631 (6th Cir. 2010) (citing *Brown v. Konteh*, 567 F.3d 191, 204–05 (6th Cir. 2009)).  "First . . . [they] must determine whether, viewing the trial testimony and exhibits in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Brown*, 567 F.3d at 205 (citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L. Ed. 2d 560 (1979)).  "Second, even were [they] to conclude that a rational trier of fact could not have found a petitioner guilty beyond a reasonable doubt, on habeas review, [they] must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable."  *Id*. (citing 28 U.S.C. § 2254(d)(2)).

*Moreland v. Bradshaw*, 699 F.3d 908, 916-17 (6th Cir. 2012), *cert denied*, __ U.S. __,

134 S. Ct. 110 (2013).

The prosecution's theory was that Petitioner aided and abetted his co-defendants in

committing felony murder.  In Michigan,

> [t]o prove felony murder on an aiding and abetting theory, the prosecution must show that the defendant (1) performed acts or gave encouragement that assisted the commission of the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result, (3) while committing, attempting to commit, or assisting in the commission of the predicate felony.  *People v. Carines*, 460 Mich. 750, 755, 597 N.W.2d 130 (1999).

> In order to satisfy the malice standard required under *People v. Aaron*, 409 Mich. 672, 299 N.W.2d 304 (1980), the prosecution must show that the aider and  abettor either intended to kill, intended to cause great bodily harm, or wantonly and willfully disregarded the likelihood that the natural tendency of his behavior was to cause death or great bodily harm. Further, if an aider and abettor participates in a crime with knowledge of the principal's intent to kill or to cause great bodily harm, the aider and abettor is acting with "wanton and willful disregard" sufficient to support a finding of malice.  *See id*. at 733, 299 N.W.2d 304; *People v. Kelly*, 423 Mich. 261,

378 N.W.2d 365 (1985).

*People v. Riley*, 468 Mich. 135, 140-141 (2003).  "A jury may infer malice from evidence

that the defendant intentionally set in motion a force likely to cause death or great bodily

harm."  *People v. Carines*, 460 Mich. at 759.  The predicate felony for the felony-murder

charge here was larceny, which is a specified felony in the felony murder statute.  *See*

Mich. Comp. Laws § 750.316(1)(b).

### 2.  Application

The Michigan Court of Appeals accurately summarized the evidence as follows:

> Here, the evidence indicated that defendant agreed to commit a
> robbery with codefendant Jackson, knowing that codefendant Jackson was
> armed with a gun.  There was evidence that the Dollar Store was robbed
> and that Mr. Zebib was shot to death during the robbery.  Defendant
> subsequently told Ramone Neal, "we just did a robbery at the Dollar Store,"
> and said that codefendant Jackson "just shot the man in the stomach."
> Defendant also told Neal that codefendant Jackson had a gun and that
> codefendant Jackson was "nothing to f ___ k with."  Defendant told the
> police that codefendant Jackson suggested the robbery, that "me and
> [codefendant Dukes] agreed with it," that codefendant Jackson had a gun,
> that they wore ski masks during the robbery, that he stood "look-out" by the
> door, that they ran from the store after codefendant Jackson shot Zebib, and
> that they split the robbery proceeds afterward.

*Ross*, 2003 WL 22439719, at *6.

This Court agrees with the Michigan Court of Appeals that a rational trier of fact

could conclude from the evidence taken in the light most favorable to the prosecution that

Petitioner was guilty of felony murder.  The evidence established that Petitioner assisted

in the crime by agreeing to rob the store and by acting as the "look-out" during the

robbery.

The intent element was satisfied because Petitioner knew that co-defendant Jackson had a gun.  A rational juror could have inferred from this evidence that Petitioner intended to create a high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result.  A rational juror also could have concluded from the evidence that Petitioner possessed the intent to create a high risk of death or great bodily harm while he was assisting his co-defendants in the commission of a larceny.  The malice element was satisfied, and the evidence was sufficient to sustain the jury's verdict on the murder count.

Even if the Court had concluded that the evidence was insufficient to sustain Petitioner's conviction for felony murder, the state court's conclusion was reasonable. Petitioner therefore has no right to relief on the basis of his sufficiency-of-the-evidence claim.

**C.  Double Jeopardy** (claim three)

Although the predicate felony for the felony murder charge was larceny, Petitioner asserts that, in reality, the predicate felony was armed robbery.  He argues that his convictions and sentences for felony murder and armed robbery violate the Double Jeopardy Clause.  The Michigan Court of Appeals agreed with Petitioner and vacated his armed robbery conviction.  Petitioner's third claim is moot, as "there is no effective relief available in federal court that [Petitioner] has not already received in state court." *Friedman's Inc. v. Dunlap*, 290 F.3d 191, 197 (4th Cir. 2002).

**D.  The prosecutor** (claim four)

28

Petitioner alleges that the prosecutor's improper and denigrating remarks about defense counsel during closing arguments constitute reversible error. The Michigan Court of Appeals reviewed this claim for "plain error" because Petitioner failed to object to most of the remarks that he challenges. The Court of Appeals went on to conclude that Petitioner's claim did not warrant a reversal of Petitioner's conviction because

> most of the remarks challenged on appeal, viewed in contest, were part of the prosecutor's larger argument of explaining why the evidence did not support the defendants' theories. Additionally, many of the challenged remarks were in response to defense issues. Even improper remarks do not require reversal when they are of a responsive nature. Further, a prosecutor does not shift the burden of proof by commenting on the improbability of a defendant's theory. To the extent that some of the prosecutor's remarks may have been ill-advised, such as the comment that the prosecutor's duty is to seek justice, any perceived prejudice could have been cured by a cautionary instruction.

*Ross*, 2003 WL 22439719, at *6 (internal and end citations omitted).

### 1. Clearly Established Federal Law

"Claims of prosecutorial misconduct are reviewed deferentially on habeas review." *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004) (citing *Bowling v. Parker*, 344 F.3d 487, 512 (6th Cir. 2003)). A reviewing court may grant relief only when the prosecutor infringes on specific provisions of the Bill of Rights or infects the trial with such unfairness as to make the resulting conviction a denial of due process. *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). To prevail on his claim, Petitioner must show that the prosecutor's conduct was so egregious "as to render the entire trial fundamentally unfair." *Cook v. Bordenkircher*, 602 F.2d 117, 119 (6th Cir. 1979). Federal courts in this

29

Circuit

> apply a "two-part test to determine whether the state court reasonably
> applied the federal standard in holding that prosecutorial misconduct did not
> render [the petitioner's] trial fundamentally unfair." *Irick v. Bell*, 565 F.3d
> 315, 324 (6th Cir. 2009).  [Courts] first determine whether the prosecution's
> conduct was improper.  *Id*.  Second, [courts] determine whether that
> improper conduct was flagrant by considering four factors: "(1) whether the
> evidence against the defendant was strong; (2) whether the conduct of the
> prosecution tended to mislead the jury or prejudice the defendant; (3)
> whether the conduct or remarks were isolated or extensive; and (4) whether
> the remarks were made deliberately or accidentally."  *Id*. (internal quotation
> marks omitted).

*Wogenstahl v. Mitchell*, 668 F.3d 307, 328 (6th Cir.), *cert. denied*, __ U.S. __, 133 S. Ct.

311 (2012).

### 2. Application

During closing arguments, the prosecutor accused defense counsel of employing a

"smoke screen" and trying to obfuscate, confuse, and scam the jurors.  (Trial Tr. Vol. XV,

59-62, Dec. 12, 2001.)  Later, the prosecutor stated that the defense attorneys' obligation

was to their clients and that they did not have a duty to seek justice, as the prosecutor did.

(*Id*. at 73.)  In his rebuttal argument, the prosecutor referred to Petitioner's attorney as "a

con man" who "[p]lay[ed] fast and loose with the evidence throughout the trial."  (Trial

Tr. Vol. XVI, 56-57, Dec. 13, 2001.)  The prosecutor also stated that both sides had

subpoena power and that, instead of calling Miss Epperson as a witness, the attorneys

"[laid] in the weeds."  (*Id*. at 64-65.)  The prosecutor ended his remarks by saying, "There

are two murderers in our midst."  (*Id*. at 70.)  Petitioner claims that the prosecutor's

remarks improperly denigrated trial counsel, shifted the burden of proof, and deprived

him of a fair trial.

Although prosecutors "may strike hard blows," they are "not at liberty to strike foul ones.  It is as much [their] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one."  *Berger v. United States*, 295 U.S. 78, 88 (1935).  In particular, prosecutors have a duty to refrain from "mak[ing] unfounded and inflammatory attacks on the opposing advocate," *United States v. Young*, 470 U.S. 1,  9 (1985), from interjecting personal beliefs into the presentation of his case," *id*. at  8-9, and from shifting the burden of proof to the defendant, *Patterson v. New York*, 432 U.S. 197, 215 (1977), or suggesting that the defendant has an obligation to produce evidence to prove his innocence.  *Joseph v. Coyle*, 469 F.3d 441, 474 (6th Cir. 2006) (quoting *United States v. Clark*, 982 F.2d 965, 968-69 (6th Cir. 1993)).

But even assuming that the prosecutor's comments in this case were improper, Petitioner is not entitled to relief unless the prosecutor's alleged improprieties were flagrant.  The prosecutor's remarks were deliberately made and fairly extensive, but the evidence against Petitioner was strong, and the defense attorneys effectively countered the prosecutor's arguments.  Counsel for co-defendant Dukes stated that he was offended by the prosecutor's remarks and that he, like the prosecutor, had taken an oath to seek justice.  (Trial Tr. Vol. XV, 78, Dec. 12, 2001.)  Petitioner's attorney countered the prosecutor's arguments by arguing that the prosecution was trying to mislead, trick, and con the jurors and that the prosecutor routinely winked and nodded at unfair, illegal

31

police conduct which resulted in confessions.  (Trial Tr. Vol. XVI, 15-16, 31, 49, 54, Dec. 13, 2001.)  Petitioner's attorney also repeatedly said that the prosecutor had tried to "bamboozle" the jurors.  (*Id.* at 21-22, 33-36, 39-40, 47, 53, 54-55.)

As in *Wogenstahl v. Mitchell*, 668 F.3d at 330, "the overall tone of the closing arguments was one of extremely zealous advocacy, accurately described as unpleasant." Given this context, and the trial court's instructions to the jurors that the defendants did not have to prove their innocence or do anything and that the attorneys' arguments were not evidence (Trial Tr. Vol. XVI, 90, 92, Dec. 13, 2001), the prosecutor's remarks could not have misled the jury or prejudiced the defense.  A trial court generally can correct improprieties in a prosecutor's closing argument "by instructing the jury that closing arguments are not evidence."  *United States v. Crosgrove*, 637 F.3d 646, 664 (6th Cir. 2011) (citing *United States v. Emuegbunam*, 268 F.3d 377, 406 (6th Cir. 2001)).

The state appellate court's determination that reversal was not required was objectively reasonable.  This Court therefore declines to grant habeas relief on Petitioner's prosecutorial-misconduct claim.

## E.  Procedural Default, "Good Cause," and the Post-Conviction Proceedings
(claims five, six, eight, thirteen, and fourteen)

Petitioner alleges that he has demonstrated "good cause" for the failure to raise his claims on direct appeal and that the doctrine of procedural default should not be used to prevent him from seeking relief on his claim about his co-defendants' statements to the police.  Petitioner also alleges that the trial court erred when it failed to rule on his *pro se*

32

claims and grant relief or an evidentiary hearing during post-conviction proceedings on

his motion for relief from judgment.

This Court has not applied the doctrine of procedural default to Petitioner's claims,

and a claim that some error occurred during state post-conviction proceedings is not

cognizable on federal habeas corpus review. *Roe v. Baker*, 316 F.3d 557, 571 (6th Cir.

2002). As recently explained in *Good v. Berghuis*, 729 F.3d 636 (6th Cir. 2013).

> it would be an unusual intrusion for federal courts to second-guess state
> procedures for resolving motions once they have been presented. States are
> independent sovereigns, and the federal government generally speaking
> should respect their choices about how to adjudicate disputes.
>
> . . . [Federal courts] must instead presume that, once a federal claim comes
> before a state court, the state judge will use a fair procedure to achieve a
> just resolution of the claim – resolving some motions with neither an
> evidentiary hearing nor an oral argument, some with an oral argument
> alone, some with both.

*Id*. at 639. The Court therefore declines to grant relief on claims five, six, eight, thirteen,

and fourteen.

## F. Petitioner's Confession (claims ten and eleven)

Petitioner alleges that the jury should not have been permitted to consider his

inculpatory statement to the police because his statement was involuntary and the result

of an illegal arrest and unnecessary delay before the arraignment. The trial court

reviewed this claim during post-conviction proceedings and found no merit in the claim.

To the extent Petitioner is raising an independent Fourth Amendment claim that

his arrest was illegal due to the lack of a warrant or probable cause, his claim is not

cognizable on habeas review because he had an opportunity for full and fair litigation of

the Fourth Amendment claim in state court. *Stone v. Powell*, 428 U.S. 465, 486 (1976).

As for the voluntariness of his statement to the police, the test is whether

> "the confession [is] the product of an essentially free and unconstrained
> choice by its maker[.]  If it is, if he has willed to confess, it may be used
> against him.  If it is not, if his will has been overborne and his capacity for
> self-determination critically impaired, the use of his confession offends due
> process."

*Schneckloth v. Bustamonte*, 412 U.S. 218, 225-26 (1973) (quoting *Culombe v.

Connecticut*, 367 U.S. 568, 602 (1961)).  When determining whether a defendant's will

was overborne in a particular case, courts must assess

> the totality of all the surrounding circumstances – both the characteristics of
> the accused and the details of the interrogation.  Some of the factors taken
> into account have included the youth of the accused, his lack of education,
> or his low intelligence, the lack of any advice to the accused of his
> constitutional rights, the length of detention, the repeated and prolonged
> nature of the questioning, and the use of physical punishment such as the
> deprivation of food or sleep.

*Id*. at 226 (citations omitted).  In a federal habeas case, "the burden of proving that the

confession was involuntary rests with the petitioner."  *Boles v. Foltz*, 816 F.2d 1132, 1136

(6th Cir. 1987) (citing *Jurek v. Estelle*, 623 F.2d 929, 937 (5th Cir. 1980)).

"[V]oluntariness need only be proven by a preponderance of the evidence."  *Id*. (citing

*Lego v. Twomey*, 404 U.S. 477 (1972)).

Petitioner's only claim regarding the voluntariness of his statement is that the

delay in arraigning him rendered his confession involuntary.  The Supreme Court

"recognized in *Gerstein* [*v. Pugh*, 420 U.S. 103 (1975)] that a person arrested without a

34

warrant is entitled to a fair and reliable determination of probable cause and that this determination must be made promptly." *Riverside v. McLaughlin*, 500 U.S. 44, 55 (1991). "[A] jurisdiction that provides judicial determinations of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement of *Gerstein*." *Id*. at 56.

Petitioner was arrested on January 6 or 7, 2001, but he was not arraigned until January 10, 2001. Nevertheless, a "delay in arraignment is not, in itself, a sufficient basis for suppressing the statement," *Brown v. Jackson*, 501 F. App'x 376, 379 (6th Cir. 2012), and there is no indication that the police delayed arraigning Petitioner to acquire more evidence against him or to induce a confession. *Cf. Norris v. Lester*, __ F. App'x __, __, 2013 WL 4516081, at *9 (6th Cir. Aug. 26, 2013) (granting habeas corpus relief where there was evidence that officers detained the suspect to gather additional evidence and because there was no alternative explanation for the prolonged detention). Petitioner voluntarily made himself available to the police on the morning of January 6, 2001, and was detained. On January 7, 2001, he waived his constitutional rights and admitted his role in the crime. He confessed less than forty-eight hours after he was detained. The Court therefore rejects Petitioner's allegation that his inculpatory statement was involuntary due to the delay in his arraignment.

The trial court's conclusion – that mere delay in the arraignment was insufficient to suppress Petitioner's confession – was objectively reasonable. Petitioner therefore has no right to relief on the basis of the delay in arraigning him.

35

**G. Trial Counsel** (claim twelve)

Petitioner alleges that his trial attorney deprived him of effective assistance during the pretrial hearing on the voluntariness of his statement to the police. Petitioner contends that trial counsel should have argued that his arrest was illegal due to a lack of probable cause and that there was unnecessary delay in the arraignment. Petitioner also asserts that trial counsel was ineffective for conceding that there was no basis for excluding the note that Petitioner passed to co-defendant Demel Dukes while both men were detained. Petitioner contends that the note was the result of his illegal detention.

### 1. Clearly Established Federal Law

The Constitution "does not guarantee the right to perfect counsel; it promises only the right to effective assistance . . . ." *Burt v. Titlow*, __ U.S. __, __, 134 S. Ct. 10, 18 (2013). To prevail on his claim, petitioner must show that his attorneys' performance was deficient and that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Hodges v. Colson*, 727 F.3d 517, 541-42 (6th Cir. 2013). An attorney's performance is deficient if "in light of all the circumstances, the identified acts and omissions were outside the wide range of professionally competent assistance." *Strickland v. Washington*, 466 U.S. at 690. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687.

"Judicial scrutiny of counsel's performance must be highly deferential." *Id*. at 689. And, because of the difficulties inherent in evaluating counsel's conduct from his or

her perspective at the time, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Id.* (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

To satisfy the prejudice prong of the *Strickland* test, Petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.  "This does not require a showing that counsel's actions 'more likely than not altered the outcome,' " but "[t]he likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 131 S. Ct. at 792 (quoting *Strickland v. Washington*, 466 U.S. at 693).

### 2.  Application

Petitioner argues that defense counsel should have moved to suppress his statement to the police on the ground that his arrest was illegal because there was no arrest warrant and the police lacked probable cause to arrest him.  The Supreme Court explained in *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004), that

> a warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed.  *See United States v. Watson*, 423 U.S. 411, 417–424, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976); *Brinegar v. United States*, 338 U.S. 160, 175–176, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949).  Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the

37

arrest.  *Maryland v. Pringle*, 540 U.S. 366, 371, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003).

Ramone Neal implicated Petitioner in the crime during an interview with the police on January 5, 2001.  His statement to the police provided the police with probable cause to arrest Petitioner.

Petitioner, however, argues that Mr. Neal was not a reliable informant.  It is true that "a search and seizure cannot be justified on the basis of conclusory allegations of an unnamed informant who is allegedly credible" and that the police must know the informant is trustworthy and has obtained information in a reliable way.  *Adams v. Williams*, 407 U.S. 143, 157 (1972) (citing *Aguilar v. Texas*, 378 U.S. 108 (1964), and *Spinelli v. United States*, 393 U.S. 410, 417 (1969)).  But "[a]n informant's tip, by itself, can suffice to create probable cause if the tip appears reliable under the totality of the circumstances."  *United States v. Cooper*, 1 F. App'x 399, 403 (6th Cir. 2001) (citing *Illinois v. Gates*, 462 U.S. 213, 230 (1983)).

Although Sergeant Maria Cox-Borkowski admitted at trial that she did not know Ramone Neal (Trial Tr. Vol. VIII, 117, Nov. 29, 2001), the fact that Mr. Neal made himself known to the police lends credence to his statement.  *United States v. Cooper*, 1 F. App'x at 403.  An officer personally interviewed Mr. Neal and was able to assess his credibility.  Furthermore, Mr. Neal provided a detailed statement, and he was a friend of the defendants.  Sergeant Cox-Borkowski found Mr. Neal's statement to be credible, in part, because she did not think Neal would fabricate information about his friends.  And,

according to her, there was no indication that Mr. Neal's statement was not credible even though he later recanted it.  (Trial Tr. Vol. VIII, 118-20, Nov. 29, 2001.)

The Court concludes that there was probable cause to arrest Petitioner, and even if his arraignment was untimely under *Riverside v. McLaughlin*, there is no indication in the record that the delay caused Petitioner to confess or to make admissions to co-defendant Demel Dukes.  He confessed in less than forty-eight hours after his arrest.  Defense counsel therefore was not ineffective for failing to argue that Petitioner's arrest was illegal or that his confession resulted from an illegal arrest or an unnecessary delay in the arraignment.

## H.  Appellate Counsel (claim nine)

Petitioner alleges that he was deprived of his Sixth Amendment right to effective assistance of counsel on direct appeal of his conviction and sentence.  The basis for this claim is appellate counsel's failure to raise the claims that Petitioner presented in his motion for relief from judgment.  Specifically, Petitioner claims that appellate counsel should have argued that Petitioner's conviction was the result of an illegal arrest and a delay in the arraignment. The trial court rejected this claim because it found no merit in the issues that appellate counsel decided not to pursue.

An appellate attorney's failure "to raise an issue on appeal can amount to constitutionally ineffective assistance," *Jalowiec v. Bradshaw*, 657 F.3d 293, 321 (6th Cir. 2011), *cert. denied*, __ U.S. __, 133 S. Ct. 107 (2012), but an appellate attorney is not

39

required to raise every non-frivolous issue suggested by the defendant. *Jones v. Barnes*, 463 U.S. 745, 751 (1983). To demonstrate that appellate counsel was ineffective, Petitioner must show (1) that his attorney unreasonably failed to discover and raise nonfrivolous issues on appeal and (2) a reasonable probability that he would have prevailed on appeal but for his appellate attorney's failure to raise the issues. *Smith v. Robbins*, 528 U.S. 259, 285 (2000) (citing *Strickland v. Washington*, 466 U.S. at 687-91, 694).

For the reasons given in the discussion above, Petitioner's arrest was based on probable cause and was legal, and there is no reason to believe that the delay in the arraignment contributed to his confession. Consequently, the issues that Petitioner claims his attorney should have raised on appeal lack merit, and there is not a reasonable probability that Petitioner would have prevailed on appeal had counsel raised the issues. An appellate attorney is not ineffective for failing to raise a meritless issue. *Shaneburger v. Jones*, 615 F.3d 448, 452 (6th Cir. 2010) (quoting *Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001)), *cert. denied*, __ U.S. __, 131 S. Ct. 1013 (2011).

## IV.  Conclusion

The state court decisions in this case were not so lacking in justification that there was an error beyond any possibility for fairminded disagreement. Accordingly, the petition for a writ of habeas corpus [Doc. No. 1] is **DENIED**.

## V.  Certificate of Appealability

Petitioner may not appeal this decision unless a district or circuit judge issues a

certificate of appealability.  28 U.S.C. § 2253(c)(1)(A); Fed. R. App. P. 22(b)(1).  A

certificate of appealability may issue "only if the applicant has made a substantial

showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "A petitioner

satisfies this standard by demonstrating that jurists of reason could disagree with the

district court's resolution of his constitutional claims or that jurists could conclude the

issues presented are adequate to deserve encouragement to proceed further."  *Miller-El v.*

*Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

When, as here, "a district court has rejected the constitutional claims on the merits, the

showing required to satisfy § 2253(c) is straightforward:  The petitioner must demonstrate

that reasonable jurists would find the district court's assessment of the constitutional

claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. at 484.

Reasonable jurists could debate the Court's assessment of Petitioner's claim under

*Crawford v. Washington* and Petitioner's prosecutorial-misconduct claim.  The Court

therefore grants a certificate of appealability on claims four and seven.  Petitioner may

proceed *in forma pauperis* on appeal because an appeal could be taken in good faith.  28

U.S.C. 1915(a)(3).

Reasonable jurists would not find the Court's assessment of Petitioner's remaining

claims debatable or wrong, nor conclude that the claims deserve encouragement to

proceed further.  The Court therefore declines to grant a certificate of appealability on

claims one, two, three, five, six, eight, nine, ten, eleven, twelve, thirteen, and fourteen.


s/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  December 24, 2013


CERTIFICATE OF SERVICE


The undersigned certifies that a copy of the foregoing order was served upon each
attorney or party of record herein by electronic means or first class U.S. mail on
December 24, 2013.


s/Deborah Tofil
Case Manager